# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| TERRANCE GARDNER and CORI GARDNER, | Civil No. 11-3528 (JRT/LIB) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| BRILLION IRON WORKS, INC., *a Wisconsin corporation*, | |
| Defendant. | |

Stephen F. Rufer and Chad R. Felstul, **PEMBERTON SORLIE RUFER & KERSHNER, PLLP**, 110 North Mill Street, Fergus Falls, MN  56537, for plaintiffs.

Nadia B. Hasan and Thomas G. Wallrich, **COZEN O'CONNOR**, 33 South Sixth Street, Suite 4640, Minneapolis, MN  55402; Tia C. Ghattas, **COZEN O'CONNOR**, 333 West Wacker Drive, Suite 1900, Chicago, IL 60606; and Joseph J. Bellew, **COZEN O'CONNOR**, 1201 North Market Street, Suite 1400, Wilmington, DE  19801, for defendant.

Terrence and Cori Gardner bring this products liability suit against Brillion Iron Works, Inc. ("Brillion"), for injuries Terrence ("Gardner") sustained while attempting to repair a piece of farming equipment manufactured by Brillion.  The Gardners bring claims for defective design strict products liability, failure to warn, breach of warranty, negligence, post-sale duty to warn, and loss of consortium.  Brillion moves for summary judgment on all of the Gardners' claims.

The Court will deny Brillion's motion with regard to the Gardners' claims for strict products liability, failure to warn, post-sale duty to warn, and loss of consortium because there are facts upon which a reasonable jury could conclude both that Gardner had no reason to think the repairs he attempted to conduct would be unsafe, and that attempting to repair farm equipment is a foreseeable use of the product. Because the Gardners do not oppose dismissal of the breach of warranty and negligence claims in the event the products liability claim is permitted to proceed, the Court will dismiss those claims.

## BACKGROUND

### I.     BRILLION'S SOIL BUILDER

Defendant Brillion began manufacturing the model CD 113 soil builder in 1977. (Decl. of Tia C. Ghattas, Ex. D (Dep. of Mike Irish ("Irish Dep.") at 8), May 31, 2013, Docket No. 51.) The soil builder, used by farmers to cultivate and dig up soil after harvest, consists of a flat frame made of steel tubes. (Irish Dep. at 8-11.) The lengthwise-tubes are the main frame tubes and across them are several "spacer" tubes, so the frame appears as a collection of connected rectangles within a larger rectangle. (*Id.*) Attached to the frame tubes are shanks, which are C-shaped hooks that dig into the ground to cultivate and dig up dirt. (*Id.*) Brillion found it would be helpful for the frame tubes to be heavy so that the shanks could dig deeper into the ground. (*Id.*) To add weight to the frame tubes, it added ballast to the tubes in the form of galvanized steel punchings, which contained zinc and cutting oil as lubricant. (*Id.*; Ghattas Decl., Ex. F

(Dep. of Oliver Kruse ("Kruse Dep.") at 14).)  Brillion's Brand Manager was not aware of any other companies that used similar materials as ballast at the time.  (Irish Dep. at 50.)

Brillion ultimately manufactured 2,386 soil builders of this model.  (*Id.* at 13.) Brillion conducted a field performance test on the model, but did not conduct any stress testing or hazard analysis on the soil builder.  (Kruse Dep. at 6, 9.)  In 1995 and 1996 two different users of the soil builder were injured when they were drilling into the sealed tubes.  (Irish Dep. at 36-37; Kruse Dep. at 10-12.)  The galvanized steel punchings that contained zinc had reacted with the moisture from the cutting oil to produce flammable gases such as hydrogen and methane.  (Kruse Dep. at 14.)  When the users drilled into the tubes, the gases streamed out and were ignited.  (Kruse Dep. at 12-14.)  Brillion learned of the injuries shortly after they occurred.  (Irish Dep. at 37.)  After the incidents, Brillion changed the design of the soil builder, both by not using steel mixtures for ballasts and by venting the tubes.  (*Id.* at 11, 45 ("[A]fter the incidents we changed to a different type. Just straight steel, no other mixture of any kind could be in with it.").)

Brillion also took steps after the incidents to advise owners not to weld or drill into the frame tubes, which Brillion's Brand Manager agreed that Brillion did because it was the "right" thing to do.  (*Id.* at 37.)  Brillion got the names of 1,600 farmers who had purchased the soil builder, either through its computer records or warranty cards, and sent an advisement to university extension services to try to reach farmers.  (*Id.* at 40-43.) Brillion stated that it was able to reach 60-70% of the owners of the soil builder, but for the remaining 30-40% it relied on the retailers and dealers to contact the purchasers to

give them the notice, even though Brillion knew that dealers were not reliable and did not usually contact the purchasers.  (*Id.* at 43, 48.)  Brillion's Manager of Engineering and Manufacturing stated that he did not know of any efforts after 1998 to get the word out to owners about the danger.  (Kruse Dep. at 28.)

## II.    THE SOIL BUILDER AT ISSUE

The soil builder at issue in this case was originally purchased by Robert Shervey, a now-retired farmer in Barrett, MN.  He purchased it in 1981 from a local dealer in Elbow Lake, MN, that went bankrupt later that year.  (Ghattas Decl., Ex. H (Dep. of Robert Shervey ("Shervey Dep.") at 7).)  He received an owner's manual and a supply catalog with the soil builder, but recalls no other pieces of paper, decals, or any other warnings on the machine.  (Shervey Dep. at 10-11.)  He did some welding repairs on the machine to strengthen the frames so they could support more substantial shanks.  (*Id.* at 11-12.) He later heard that it was a hazard to weld on the tubes:

> I know it was a danger with welding on these tubes.  I don't remember how.  Or if I got a letter on it or if I read about it or heard it or whatever? But this was – I had already welded on it.  So this would have been many years since, you know, from when it was new.

(*Id.* at 11.)  When asked about whether he had been told that there was a problem or a hazard if he drilled into the soil builder he answered: "No. Just welded." (*Id.* at 35.)  He clarified that "I did not know it was a chemical – flammable gas inside those tubes. I just knew it was a hazard to weld on that tube." (*Id.* at 64.)  He acknowledged that if he had known about the danger with welding, he wouldn't have welded on it, but that before he

knew that he "probably would have" welded or drilled on a sealed vessel because he "wouldn't have known any different." (*Id.* at 59.)

In or around 2005 Robert Shervey sold his farm to his daughter and son-in-law, Ronald Schack. (Ghattas Decl., Ex. G (Dep. of Ronald Schack ("Schack Dep.") at 11).) Shervey told Schack that the tubes could not be welded on because "they could explode." (Schack Dep. at 27.) Schack did not use the soil builder for many years, but in 2011, he wanted to use it for harvesting. (*Id.* at 26.) He decided it would need repairs, and approached a repair shop, of which Gardner was an owner and principal. (*Id.* at 34-35; Ghattas Decl., Ex. I (Dep. of Terrence Gardner ("Gardner Dep.") at 23.) Gardner is an experienced metal worker with an associate's degree in mechanical and design technology and has worked for twenty-four years in the mechanic industry. (Gardner Dep. at 9-22.) Gardner agreed to look at the soil builder and went out to Schack's farm to look at it. (Schack Dep. 36-37.) Schack mentioned to him "that we can't weld on it so we might need to put a structure across to try to hold it altogether." (Schack Dep. at 37.) After Schack told him this, Gardner was surprised and asked, "you can't weld on it?' and Schack said "No, you can't." (*Id.* at 37-38.) When Gardner asked why, Schack said "apparently there's something in the tubes and they can blow up." (*Id.* at 38.) Gardner agreed to do the repairs and Schack brought the soil builder into Gardner's shop in September 2011. (Gardner Dep. at 40.)

In his deposition, Gardner described the warning he received from Schack about welding on the tubes:

> He told me that these main 4 by 4 cross tubes were filled with a weight adding material, which made it dig better in the field and stuff.  Was or could be flammable, he wasn't sure, so that those were not to be welded on directly.

(*Id.* at 57-58.)  Gardner didn't ask Schack how he knew there was material in the tubes, as Schack volunteered that his father told him.  (*Id.* at 71.)

## III.   GARDNER'S ATTEMPT TO REPAIR AND INJURY

Once the soil builder arrived in Gardner's shop, he told his employees that the soil builder could not be welded on.  (Ghattas Decl., Ex. K (Dep. of Josh Warner ("Warner Dep.") at 38, 64); *id.*, Ex. L (Dep. of David Kjorness ("Kjorness Dep.") at 33).)  Gardner's employees testified that they received instructions not to weld on it, but did not hear that drilling on it would cause flames.  Employee Josh Warner testified: "I don't remember hearing 'flammable,'" just that it could explode.  (Warner Dep. at 42.)  Employee David Kjorness was instructed not to "heat the tubes, the main tubes of the machine because they were loaded," but he "didn't think it would hurt anything to drill into it."  (Kjorness Dep. at 40.)  He explained, "[t]he way I understood it is you couldn't heat it or it would become explosive.  That's why we opted to drill it, because there was no heat involved then."  (*Id.*)

Before embarking on any repairs, Gardner asked around – and other farmers – to see if anyone knew what might be in the frame tubes that would be flammable.  (Gardner Dep. at 72, 83-84.)  He testified that when he talked to other farmers, everyone's response was "Why would they put something flammable in something that you're going to repair?"  (*Id.* at 85.)  On the day he began doing repairs, he called Titan, a company he

had purchased farm equipment from in the past, as "one last safety precaution to see if [they] had ever heard of any manufacturer putting any type of material in a piece of farm equipment that would be flammable." (*Id.* at 98.)  The response he received was: "Why would any manufacturer put something flammable in a piece of material – or in a piece of equipment that would have to be repaired?" (*Id.* at 99.)

Gardner then commenced the repair process.  First, two of Gardner's employees used grinding cutters to remove pieces that had been welded to the spacer tubes during Mr. Shervey's repairs.  (Warner Dep. at 24-28.)  After they did this, Gardner set out to drill a hole into one of the tubes to determine what was inside and to see what, if any, flammable material the tubes contained.  (Gardner Dep. at 87.)  He was wearing leather gloves, safety glasses, his general rented uniform, a cotton t-shirt, bluejeans, underwear, socks, and steel-toed boots.  (*Id.* at 120.)  He drilled into the tube, and once he punctured it a shot of flame came out of the hole that he and his employees described as comparable to a jet engine flame.  (Warner Dep. at 44-45; Schack Dep. at 66.)  Josh Warner testified that he did not see any sparks while Gardner was drilling or hear any metal grinding. (Warner Dep. at 43.)  The flame burned Gardner on his face, neck, arms, and upper body. Warner and Kjorness put out the fire on Gardner and Gardner went to his wife's office (she worked in the shop) and immediately went to the hospital.  (Gardner Dep. at 130.) Gardner's employees claimed that five minutes after he left, the drill he was using was still on fire.  (Warner Dep. at 46.)

Gardner, Warner, and Kjorness maintained in their deposition testimony that they had no idea it would be dangerous to drill into the tubes even though they knew not to

weld, because drilling involves very little heat, especially compared to welding. (*See* Kjorness Dep. at 40 ("The way I understood it is you couldn't heat it or it would become explosive. That's why we opted to drill it, because there was no heat involved then."); Warner Dep. 38-42, 64.) Gardner was asked during his deposition:

> Q: Knowing that Mr. Schack had told you he believed there was something in there that possibly could be flammable, do you think it would have been prudent to find out what was in there before you began working on it?
>
> A: I guess, no, I wasn't worried about it. . . .
> He told me that you couldn't weld directly to those tubes because what was in there was flammable. . . .
> I knew we were not going to be directly welding to those tubes.
>
> Q: But the work you were doing would have applied heat to the tubes and the drilling itself would have transferred heat from where you were drilling into the tube?
>
> A: Ah, a little bit, yes.

(Gardner Dep. at 72-73.) Gardner testified that drilling could generate up to 95 degrees in heat – that the 3/16 inch hole he made would have been cool enough that he would have been able to put his finger on it "for as long as you wanted me to." (*Id.* at 90.) In contrast, he testified that it takes over 2,000 degrees of heat to weld steel. (*Id.* at 60.) He also testified that in his experience drilling does not generate a spark even though it creates friction. (*Id.* at 88 (answering "[n]ot that I can remember, no" to the question of whether he has ever generated a spark when he was drilling with a metal bit on a piece of steel, and that drilling creates potential for a spark only if it is not done properly).) He testified that he examined the tubes beforehand and saw that they were sealed, but did not believe that they were completely sealed (such that there could be pressurized gas in

them) because they were not stamped by a certified welder, which is usually required for a tube to be considered completely sealed.  (*Id.* at 70.)

## IV.    THIS ACTION

Gardner and his wife brought this action against Brillion, alleging claims for strict product liability for defective design, failure to warn, breach of warranty, negligence, post-sale failure to warn, and loss of consortium.  Brillion moves for summary judgment on all claims.

## DISCUSSION

## I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion

for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247–49).

## II.   DESIGN-DEFECT STRICT PRODUCTS LIABILITY

To recover under a defective design strict products liability theory, an injured party must establish (1) that the product was in a defective condition unreasonably dangerous for its intended use; (2) that the defect existed when the product left the defendant's control; and (3) that the defect was the proximate cause of the injury sustained. *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 623 n.3 (Minn. 1984); *see also Drager ex rel. Gutzman v. Aluminum Indus. Corp.*, 495 N.W.2d 879, 882 (Minn. Ct. App. 1993). "Whether a product is defective is generally a question of fact; only where reasonable minds cannot differ does the question become one of law." *Thompson v. Hirano Tecseed Co.*, 456 F.3d 805, 809 (8th Cir. 2006).

Brillion argues that Gardner has failed to present sufficient evidence upon which a reasonable jury could find for him on any of these three elements, but Brillion focuses its argument on two main points that relate to the first element, leaving little dispute as to the remaining elements.[1]   First, Brillion argues that the soil builder was not defective **with**

---

[1] With regard to the second element, Brillion makes no real argument that the relevant condition of the soil builder materially changed after it left Brillion's control (besides arguments about Gardner's use of the machine – which relate to element one).  With regard to the third element, there is no dispute that the flammable material inside the frame tubes of the soil builder

(Footnote continued on next page.)

**regard to Gardner** because Gardner did not use it as intended, and rather misused it by drilling into it. Second, Brillion argues that Gardner was aware of the specific danger posed by the soil builder and nevertheless assumed the risk of that danger by choosing to drill into it. The Court will address each of these arguments.

### A.    Defective Condition Unreasonably Dangerous for its Intended Use

There is little dispute that the flammable material in the soil builder's tubes made it unreasonably dangerous. The soil builder model purchased by Shervey and repaired by Gardner was an inert piece of farm equipment that, unbeknownst to Brillion when it produced the machine, had the potential to explode upon exposure to heat. Once Brillion became aware of the possibility that the cut steel ballasts and oil could produce flammable gas, and after this design caused injury to two users, Brillion changed its design to add ventilation holes into the tubes. (*See* Irish Dep. at 11, 45.) Gardner's expert stated in his affidavit that Brillion failed to do a hazard analysis or long-term testing, which is standard, and if it had it would have discovered the flammability of the tubes and could have corrected it by using a non-hazardous ballast material. (Aff. of Lanny Berke ¶¶ 3, 7, 9, June 21, 2013, Docket No. 55.) Gardner's expert also stated that Brillion "did not have people with the proper technical education and backgrounds review and oversee the design and manufacturing of the cultivator," as "[a] qualified

_____

(Footnote continued.)

caused Gardner's injuries, rather, Brillion argues that Gardner's drilling caused his injuries, which the Court addresses in its analysis of Brillion's two main arguments above.

metallurgist would have recognized the potential for hydrogen gas to be developed in the sealed tubes." (*Id.* ¶ 9.)  Brillion's Brand Manager testified that no other manufacturers at the time were using the ballast material that Brillion did.  (Irish Dep. at 50.)  Brillion's chosen design caused injury to two users in the 1990s, and after those incidents Brillion changed its design to vent the tubes rather than sealing in the hazardous material.

Thus, the question presented by Brillion's argument is not about the defective nature of the soil builder, but is instead about whether Gardner's drilling into the tube could be reasonably viewed as the machine's **intended use**.  Brillion argues that no reasonably jury could find that using a high-speed drill with a metal drill bit to drill into the sealed metal framing of the soil builder was a "manner for which the product was intended."  (Mem. in Supp. of Mot. for Summ. J. at 9, May 31, 2013, Docket No. 50 (citing *Burris v. Versa Prods., Inc.*, Civ. No. 07-3938, 2009 WL 3164783, at *2 (D. Minn. Sept. 29, 2009)).)  But the standard for this element of a defective design claim is broader than Brillion claims.  Instead, a party can succeed on this element by showing that a product is unreasonably dangerous when used in the manner for which it was intended, "as well as an **unintended yet reasonably foreseeable use**."  *Bilotta*, 346 N.W.2d at 621 (emphasis added) (internal quotation marks omitted); *see also Mozes v. Medtronic, Inc.*, 14 F. Supp. 2d 1124, 1127 (D. Minn. 1998).

Gardner presents sufficient facts upon which a jury could conclude that repairing a piece of farm equipment by drilling into a steel four-by-four inch tube that appears to be inert is reasonably foreseeable use.  Gardner's expert states that "[o]ne alternate use of this product which is obvious and would have been made obvious during a hazard

analysis is that farmers will modify the machine to make it more useful to the farmer" and that

> [i]t is reasonably foreseeable that farmers will cut into, drill into, and weld onto this tubing to modify the design to meet their specific needs. Even though Brillion does not want anyone to do this, they know that this is in the very nature of farmers, and it is reasonably foreseeable.

(Berke Aff. ¶¶ 3, 9.) Even Brillion's witnesses acknowledged this – the Brand Manager stated that "[h]istorically farmers are very self-sufficient. If they have the skills they would [make their own repairs on machines]." (Irish Dep. at 20-21.) Brillion's Manager of Engineering and Manufacturing acknowledged that at some point "almost any piece of equipment will need some sort of repairs." (Kruse Dep. at 20.) Furthermore, Gardner testified that the farmers and retailer he spoke to reacted to his question about flammable materials by wondering why a manufacturer would put flammable materials into a piece of equipment that farmers will inevitably attempt to repair. (Gardner Dep. at 85, 99.)

Thus, the Court cannot conclude as a matter of law that attempting to repair a piece of farm equipment, including drilling into a steel tube, is beyond the scope of the intended use of such a product for the purposes of a defective design products liability claim. Whether Gardner's drilling was within the intended use or reasonably foreseeable use of the soil builder is a question for the jury.

### B.    Assumption of Risk

Brillion also argues that Gardner's defective design claim must fail because Gardner knew of the defect and its dangers and nevertheless assumed the risk of

explosion by drilling into the tubes.[2]   In a strict liability action under Minnesota law, only a "primary" assumption of the risk defense is available (as opposed to a defense of "secondary" assumption of the risk).   *See Daly v. McFarland*, 812 N.W.2d 113, 120 n.1 (Minn. 2012) ("Primary assumption of risk is also applied to theories of recovery based on strict products liability theory and strict liability for abnormally dangerous activities."); *Armstrong v. Mailand*, 284 N.W.2d 343, 352 (Minn. 1979) (secondary assumption of risk is available only in a negligence action, but "a plaintiff may, implicitly or expressly, manifest his consent to relieve the defendant of his duty under the theories of strict liability, and, therefore, the doctrine of primary assumption of the risk may be utilized in actions based on strict products liability and strict liability for an abnormally dangerous activity").

Primary assumption of risk is very limited under Minnesota law.  *Reimer v. City of Crookston*, 326 F.3d 957, 968 (8th Cir. 2003) ("Minnesota courts rarely apply primary assumption of the risk, and have found that its application is only appropriate under limited circumstances." (internal quotation marks omitted)) (collecting cases).   Courts

---

[2] In addition to this assumption of risk argument, Brillion appears to make a separate argument that Gardner "knew of the alleged defect for which he currently attempts to recover." (Mem. in Opp. to Mot. for Summ. J. at 9.)  It is not clear how this is distinct from assumption of risk, although it appears to be based on *Magnuson v. Rupp Manufacturing, Inc.*, 171 N.W.2d 201, 207 (Minn. 1969), which held that a product could be deemed not defective with regard to a particular user if the user was aware of the defect.  *See Lee v. Crookston Coca-Cola Bottling Co.*, 188 N.W.2d 426, 432 (Minn. 1971) ("[R]ecovery is barred by concepts of contributory negligence and assumption of risk if the injured party discovers the defect, knows the dangers arising from it, and nevertheless uses the product, or if he makes abnormal use of the product.").  The Court will address the substance of this argument – whether Gardner was aware of the risk of the specific danger that caused his injury – in its analysis of Brillion's assumption of risk argument.

have rarely found the evidence of the plaintiff's actions to be "so clear and undisputed as to present no fact issues for the jury to decide" and therefore to "constitute primary assumption of risk as a matter of law." *Id.* (internal quotation marks omitted).   The doctrine is limited to certain types of circumstances and has typically been applied only in cases involving patrons of inherently dangerous sporting events, such as amateur golf, auto-racing, or hockey. *McFarland*, 812 N.W.2d at 119-20 (citing *Grisim v. TapeMark Charity Pro–Am Golf Tournament*, 415 N.W.2d 874, 876 (Minn. 1987); *Wagner v. Thomas J. Obert Enters.*, 396 N.W.2d 223, 226 (Minn. 1986); *Rieger v. Zackoski*, 321 N.W.2d 16, 23–24 (Minn. 1982); *Modec v. City of Eveleth*, 29 N.W.2d 453, 457 (Minn. 1947)); *see also Moe v. Steenberg*, 147 N.W.2d 587, 589 (Minn. 1966) (primary assumption of risk applies to ice skating participants).   In contrast, the Minnesota Supreme Court has held that snowmobiling does not fall into the narrow category of inherently dangerous activities subject to primary assumption of risk because hazards like tipping or rolling could be successfully avoided. *Id.* at 120.

Minnesota courts provide little guidance as to whether the doctrine of primary assumption of risk applies to the specific activity of farm equipment or repair generally. Thus, the Court will analyze as a matter of first impression whether the doctrine can apply to Gardner's repair here under the basic elements of primary assumption of the risk.[3]   For primary assumption of risk to apply, the injured party must have (a) had

---

[3] The Court's role is to predict how the Minnesota Supreme Court would resolve this unanswered question of state law. *See AMCO Ins. Co. v. Inspired Techs., Inc.*, 648 F.3d 875, 880 (8th Cir. 2011).

knowledge of the risk; (b) appreciated of the risk; and (c) had a choice to avoid the risk but voluntarily chose to chance the risk. *Andren v. White-Rodgers Co.*, 465 N.W.2d 102, 104-05 (Minn. Ct. App. 1991) (citing *Armstrong*, 284 N.W.2d at 351).

Minnesota courts construe the relevant risk narrowly. *Reimer*, 326 F.3d at 969 (noting Minnesota Supreme Court "reject[ed] a generalized approach in favor of a 'more detailed' inquiry into the 'particular risk'" causing the injury" and collecting cases); *see also Rieger*, 321 N.W.2d at 23 (rejecting defendant's attempt to characterize risk generally as leaping over racetrack fence and instead stating that particular risk was leaping the fence "after the races had concluded for the day" when such conduct "may well have been presumed to be acceptable" (emphasis omitted)).

Construing the relevant risk narrowly, the Court concludes that a reasonable jury could find that Gardner did not have knowledge or appreciation of the particular risk posed by the soil builder which caused his injury. Narrowly construed, the risk that ultimately caused Gardner's injury was that the frame tube of the soil builder could explode into flames if he drilled into it. Although the record indicates that Gardner was aware of the risks of **welding** the frame tubes, there is little in the record to suggest that Gardner was aware that **drilling** into the frame tubes created a risk of flame. (*See* Schack Dep. at 37, 64 (Schack did not mention anything to Gardner about cutting into the tubes); Gardner Dep. at 57-58, 72-73 (Schack told Gardner that "you couldn't weld directly to those tubes because what was in there was flammable"); Warner Dep. at 38, 64; Kjarness Dep. at 33, 40.) The difference is significant: Gardner testified that welding steel requires temperatures upwards of 2,000 degrees, whereas drilling into steel generates

temperatures that are safe to touch – approximately 95 degrees, and that he could not remember ever before generating a spark from drilling. (Gardner Dep. at 59-60, 88-90.)

Furthermore, the record indicates that Gardner was aware that the frame tubes contained some kind of flammable material, but the deposition testimony in the record is consistent that Gardner was not aware that there might be flammable **gas** in the frame tubes. (*See, e.g.*, Schack Dep. at 38 (when Gardner asked Schack why he could not weld on the tubes, Schack told him that "apparently there's something in the tubes and they can blow up"); Gardner Dep. at 57-58 (Schack told him that the frame tubes "were filled with a weight-adding material" that "was or could be flammable, he wasn't sure").) A reasonable jury could find that Gardner anticipated that with flammable, non-gas, material, the risk of explosion was created only with exposure to actual flame (e.g. a welding torch), and that because he had never experienced sparks with drilling in the past and because drilling generates significantly less heat than welding does, he did not have knowledge of or appreciation for the specific danger of drilling into the frame tubes.

The Eighth Circuit's decision in *Reimer v. City of Crookston*, 326 F.3d 957, is instructive here. There a boiler operator was injured while repairing a boiler when he bumped a corroded piece of the boiler vessel and boiling water and steam exploded through the hole where the piece had been. *Reimer*, 326 F.3d at 960-61. The Eighth Circuit noted that the plaintiff's knowledge and appreciation of the risk turned on many factors, including: the nature of the repair problem as originally described, whether the plaintiff and other similarly trained repair experts ever took additional precautions that would have prevented the injury (e.g. inspecting the boiler, which would have revealed

the corrosion), and what the plaintiff was told about the corrosion as a risk-enhancing condition. *Id.* at 969.

The court in *Reimer* found that many of the facts were favorable to the plaintiff: he considered his repair to pose little risk, had done similar repairs many times – even working on rusty boilers without letting them cool down first, and he had no prior discussion which suggested this posed a heightened risk. *Id.* The court found that these facts created a genuine issue as to the plaintiff's actual knowledge and appreciation of the risk and that a reasonable jury could conclude that based on "the information he possessed at the time and given the task he was performing, the risk of [his injury] was neither a reasonably apparent danger nor a reasonably foreseeable incidental risk," despite several facts suggesting otherwise. *Id.* at 969-70. Those facts included that he was an experienced expert in the field of this type of repair, that it would have been very easy to avoid the injury (by turning off the boiler and letting it cool overnight), and that the plaintiff admitted that he saw some corrosion on the piece prior to performing the test. *Id.* at 970. The court held that nevertheless, material fact disputes remained as to whether he had "**actual knowledge** of the risk" and whether a "reasonable person in [his] position must have understood the danger." *Id.* (emphasis in original) (internal citations omitted).

Here, Gardner knew that welding on the tubes could cause a flame or explosion, but he has presented sufficient facts upon which a jury could find that he did not **actually know** that **drilling** into the tubes could similarly cause an explosion. He has also presented sufficient testimony suggesting that a reasonable person in his position would not have appreciated or understood that drilling would pose the same risk as welding,

given that it generates significantly less heat, nor that whatever flammable material was in the soil builder could ignite into flames upon being drilled into.   Thus, this case is distinct from *Andren v. White-Rogers*, where the plaintiff lit a cigarette in a basement that the plaintiff had just noticed reeked of natural gas.   465 N.W.2d at 105 ("Andren's lighting of a cigarette in a gas-filled room was a voluntary acceptance of a known danger.").   The danger here was not nearly as evident to Gardner as the smell of gas was to Andren.   By direct comparison, a reasonably jury could find that it would be reasonable to not anticipate that drilling into metal in a room that reeked of gas would cause flames.

Therefore, the Court will deny Brillion's motion for summary judgment with regard to Gardner's defective design products liability claim.   A reasonable jury could conclude that the soil builder was defective and unreasonably dangerous for its intended use – it was unreasonably dangerous to have a piece of farm equipment that could explode if anyone attempted to repair it by welding or drilling, given that repair is expected with farm equipment.   Although Gardner was aware that it was dangerous to weld on the frame tubes, that knowledge does not require a jury to conclude that he was aware or should have been aware that drilling on the frame tubes would be comparably dangerous.

## III.    FAILURE TO WARN

Under Minnesota law, suppliers generally have a "duty to warn end users of a dangerous product if it is reasonably foreseeable that an injury could occur in its use."

*Gray v. Badger Mining Corp.*, 676 N.W.2d 268, 274 (Minn. 2004).  "[W]here the manufacturer or the seller of a product has actual or constructive knowledge of danger to users, the seller or manufacturer has a duty to give warnings of such dangers.  *Frey v. Montgomery Ward & Co.*, 258 N.W.2d 782, 788 (Minn. 1977).

Brillion does not dispute that it had actual knowledge of the danger that the soil builder could emit flames upon being drilled into.  Rather, Brillion argues that it was not obligated to warn against drilling into the frame because it is not obligated to warn of dangers that would arise by **improper** use, and because it had no duty to inform Gardner of a danger of which he already should have known.  This argument raises essentially the same two issues as in Brillion's products liability argument – that Gardner used the soil builder improperly by drilling into it and that Gardner should have known that drilling into the frame tubes could ignite flammable materials.  Thus, for the same reasons explained above with regard to products liability, the Court will not grant Brillion's motion for summary judgment with regard to Gardner's failure to warn claim because a reasonable jury could find both that Gardner's drilling was within the scope of anticipated use of the soil builder and that Gardner did not know and should not have known that it was dangerous to drill into the tubes.

To the extent that Brillion additionally argues that it escapes liability for failure to warn because "there is no reason to believe that a warning label would have done anything more to impress" or alter Gardner's behavior, *see Balder v. Haley*, 399 N.W.2d 77, 82 (Minn. 1987) ("The foolishness of attempting to fix a gas line that was leaking significant amounts of gas is apparent.  There is no reason to believe that a warning label

would have done anything more to impress Balder or his mother.  Thus, the issue of causation in this case does not require a jury determination.").  Gardner presents testimony disputing the futility of a warning.  When asked what should have been posted on the machine, he stated: "A warning label" that says "[c]ontains flammable gas, do not heat, drill, weld, cut."  (Gardner Dep. at 101.)  The questioning continued: "But you knew before you began drilling into it that there was a potential, that there was something flammable in there?" to which he answered: "I was aware that the weight adding material might be flammable." (*Id.*)  Thus, whether or not a warning would have been futile (such that the lack thereof could not have been a proximate cause of Gardner's injury), is a material disputed fact that must be presented to the jury.  In addition to believing Gardner's own testimony that a warning about drilling would have altered his behavior, a jury could infer from the fact that he was warned not to weld and took great care not to weld, that if he had been warned not to drill, he would have also avoided doing that.  The Court will deny Brillion's motion for summary judgment with regard to the claim for failure to warn.

## IV.    BREACH OF WARRANTY AND NEGLIGENCE

In addition to the claims for strict products liability, Gardner brings claims for breach of warranty and negligence.  Under Minnesota law, "strict products liability has effectively preempted implied warranty claims where personal injury is involved."  *In re Levaquin Prods. Liab. Litig.*, 752 F. Supp. 2d 1071, 1079 (D. Minn. 2010) (alteration and internal quotation marks omitted).  Similarly, "with respect to failure-to-warn and

design-defect claims, the theories of negligence and strict liability are effectively merged into a single theory of products liability," such that the jury cannot be instructed on both theories and should rather be instructed on one theory of products liability. *Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1146 (D. Minn. 2011) (citing *Bilotta*, 346 N.W.2d at 623). For these reasons, the Gardners have not opposed dismissal of both the breach of warranty and negligence claims in the event that the Court permits the defective design strict products liability claim to proceed. Thus, because the Court will deny summary judgment on that claim, the Court will dismiss the claims for breach of warranty and negligence.

## V.     POST-SALE DUTY TO WARN

"Under Minnesota products liability law, a continuing duty to warn of dangers associated with using a product arises only in 'special cases.'" *Ramstad v. Lear Siegler Diversified Holdings Corp.*, 836 F. Supp. 1511, 1517 (D. Minn. 1993) (citing *Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826, 833 (Minn. 1988)). The special circumstances in *Hodder* included: (1) the defendant's knowledge of problems with the product for many years, including knowledge that the product might explode with little provocation; (2) the hidden nature of the danger; (3) the fact that when explosions did occur, serious injury or death usually resulted; (4) that the defendant remained in that line of business, continued to sell parts for use with the product and had advertised the product within five years of the plaintiff's injury; and (5) that the defendant had undertaken a duty to warn of product dangers. *Hodder*, 426 N.W.2d at 833. "The

question of whether a legal duty to warn exists is a question of law for the court – not one for jury resolution." *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 924 (Minn. 1986).

A legal continuing duty to warn, although arising only in special circumstances, is not rare. Courts have found such a duty with regard to a variety of products, including where the addition of a velcro strip on a motorcycle helmet that may "induce users to attach the chin strap improperly" may have contributed to the death of a motorcyclist, *McDaniel v. Bieffe USA, Inc.*, 35 F. Supp. 2d 735, 736-37 (D. Minn. 1999), tires that exploded upon inflation, *Crowston v. Goodyear Tire & Rubber Co.*, 521 N.W.2d 401, 405, 409 (N.D. 1994), and intrauterine devices that caused infertility, *Kociemba v. G.D. Searle & Co.*, 707 F. Supp. 1517, 1523, 1529 (D. Minn. 1989) (noting "[l]ike the defendant in *Hodder*, defendant in this case initially undertook a duty to test the product and warn of dangers associated with its use. Clearly, this case is the type of 'special case'" identified by the *Hodder* court.").

The *Hodder* factors weigh in Gardner's favor here. First, Brillion knew that its tubes could produce and contain pressurized flammable gases as early as 1995, after which it altered its design to avoid the danger posed by its previous use of un-clean steel with no vent holes. Second, the danger was completely hidden: Gardner presents extensive testimony that no farmer, retailer, or even any other manufacturer at the time had heard of or used Brillion's design for the tubes, which ultimately rendered them so dangerous. The sealed tubes looked as though there would be nothing in them, much less flammable gases. Third, when explosions occurred, they caused serious injury – both in

the two accidents in the 1990s and for Gardner.  Fourth, Brillion continued to sell the soil builder after those accidents (and after it altered its design).  Finally, Brillion undertook efforts to warn its customers of the dangers and clearly understood that the "right" thing to do was to attempt to inform all owners and users of the soil builder of the potential for explosion.  (*See* Irish Dep. at 37.)

In addition to the *Hodder* factors, courts have also considered the burden of locating and warning purchasers (and subsequent purchasers) of mass-produced and widely distributed consumer products in deciding whether there is a post-sale duty to warn.  *See McDaniel*, 35 F. Supp. 2d at 741.  This consideration also counsels in Gardner's favor here.  The soil builder was not a mass-produced and widely distributed consumer product:  Brillion manufactured only 2,386 units of this model of soil builder, which is a specific type of product aimed at a specific industry.  In addition, Brillion's Brand Manager admitted that "[t]he majority of the machines that were sold were sold in a very small geographic area . . . from New York and Pennsylvania to Minnesota, and maybe northern Illinois."  (Irish Dep. at 49.)  Thus, a post-sale duty to locate and warn any potential owners of this soil builder model would not have imposed the kind of heavy burden discussed in *McDaniel*.

Brillion points to two cases which it claims indicate that there is no post-sale duty to warn here because there were only two prior similar incidents.  *See Keller v. CNH Am., LLC*, Civ. No. 07-1648, 2009 WL 1766695 (D. Minn. June 22, 2009) ("The existence of only a couple of possibly similar accidents weighs against a determination that a post-sale duty to warn exists."); *Ramstad*, 836 F. Supp. at 1517 (no post-sale duty to warn where

manufacturer "had notice of only a handful of other accidents").   However, the fact that there were only two accidents, out of 2,386 machines, does not counsel as strongly against finding a continuing duty to warn in this case as it did in *Ramstad* and *Keller*.   In *Keller*, the manufacturer had not undertaken any duty to warn, as Brillion has done here.   *See Keller*, 2009 WL 1766695 at *7 ("[T]here is no evidence that CNH undertook a duty to warn.").   In *Ramstad*, the court found that none of the factors were present except for the "gravity of the resulting harm," which alone was "insufficient to satisfy the special circumstances required by *Hodder*."   *Ramstad*, 836 F. Supp. at 1517.   As discussed above, many of the *Hodder* factors are present here.

For these reasons, the Court concludes that Brillion had a post-sale duty to warn of the soil builder's potential flammability, so the questions of whether Brillion breached that duty and whether any breach was the cause of Gardner's injuries must be submitted to the jury.   *See Hodder*, 426 N.W.2d at 833 (affirming jury instruction of continuing duty to warn accompanied by breach and causation questions).

## VI.   LOSS OF CONSORTIUM

Cori Gardner brings a loss of consortium claim against Brillion based on the injuries to Terrance Gardner.   With regard to this claim, Brillion argues only that this claim must fail because it is derivative of the other claims against Brillion, which also should fail.   *See Peters v. Bodin,* 65 N.W.2d 917, 922 (Minn. 1954).   Because the Court will deny summary judgment on the claims for products liability, failure to warn, and

post-sale duty to warn, the Court will deny Brillion's motion for summary judgment with regard to Cori Gardner's claim for loss of consortium.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Brillion Iron Works, Inc.'s Motion for Summary Judgment [Docket No. 47] is **GRANTED in part** and **DENIED in part** as follows:

1.     The motion is **GRANTED** with respect to the causes of action for breach of warranty (Count 3) and negligence (Count 4).  These claims are **DISMISSED with prejudice**.

2.     The motion is **DENIED** with respect to the causes of action for products liability (Count 1), failure to warn (Count 2), post-sale duty to warn (Count 5), and loss of consortium (Count 6).

DATED:  February 19, 2014
at Minneapolis, Minnesota.

_____s/ John R. Tunheim_____
JOHN R. TUNHEIM
United States District Judge